NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF PARKS AND RECREATION, PETITIONER v. L. CLIFTON CARROLL, RESPONDENT

No. 329PA03

(Filed 13 August 2004)

## 1. Public Officers and Employees— state employee—appeal of disciplinary action

A state employee appealing a disciplinary action must pursue the grievance procedures of the agency and then file a contested case with the Office of Administrative Hearings. The employee

has the right to present evidence and examine witnesses, and the Administrative Law Judge must decide the case only on the basis of evidence presented and facts officially noticed and made a part of the record. The Administrative Law Judge must issue a decision (formerly, and in this case, a recommended decision) with written findings and conclusions. Appeal is to the State Personnel Commission, which issues a final agency decision. That decision is subject to judicial review in the Superior Court, and then in the Appellate Division.

## 2. Administrative Law— whole record and de novo review— distinctions

Grounds for reversal or modification of an administrative agency's final decision fall into two conceptual categories: law-based inquiries and fact-based inquiries. Law-based inquires receive de novo review, in which the trial court gives the matter new consideration and may substitute its own judgment for that of the agency. Fact-based inquiries receive a whole record review, in which the court examines all of the evidence in the record for substantial evidence supporting the agency's decision, and may not substitute its judgment for that of the agency.

## 3. Administrative Law— de novo review—findings

Except as partially abrogated by N.C.G.S. § 150B-51(c), findings by an administrative agency supported by substantial competent evidence in view of the entire record are binding on a reviewing court conducting de novo review and the court lacks authority to make alternative findings at variance with the agency's. The court is not required to issue new findings when conducting de novo review of a question of law in a contested case (not to be confused with a de novo hearing or trial mandated by statute).

## 4. Administrative Law— misapprehension of law—remand not required

When an order or judgment is entered under a misapprehension of the law, an appellate court may remand for application of correct legal standards, but remand is not automatically required. Here, the trial court's erroneous application of the de novo review standard did not interfere with the Supreme Court's ability to assess how that standard should have been applied.

**5. Public Officers and Employees— park ranger—speeding— not personal misconduct sufficient for demotion**

In light of the circumstances, a park ranger's conduct did not rise to a level justifying the disciplinary actions taken where he sped for a brief time on an open stretch of road, with due regard for the safety of others, in the reasonable belief that it was necessary because of a medical emergency.

**6. Public Officers and Employees— park ranger—demotion— use of emergency vehicles—perceived medical emergency**

A park ranger's alleged willful violation of written guidelines for the use of emergency vehicles did not constitute just cause for his demotion where the whole record supported the conclusion that he was motivated by the reasonably perceived necessity of a medical emergency. The trial court, conducting a whole record review, impermissibly re-weighed the credibility of the ranger's testimony concerning his motivation. The ranger's obligation to assist those in need did not cease to be a law enforcement function because a family member was involved.

**7. Administrative Law— judicial review—scope—findings on unresolved issue**

The trial court exceeded its scope by making findings and resolving a conflict not addressed by the State Personnel Commission in a contested case involving a park ranger's conduct in dealing with other officers. However, remand was not necessary because the alleged conduct did not constitute just cause for demotion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, 157 N.C. App. 717, 580 S.E.2d 99 (2003), affirming an order entered 4 March 2002 by Judge Orlando F. Hudson, Jr., in Superior Court, Wake County. Heard in the Supreme Court 17 February 2004.

*Roy Cooper, Attorney General, by Edwin Lee Gavin II, Assistant Attorney General, for petitioner-appellee.*

*The McGuinness Law Firm, by J. Michael McGuinness, for respondent-appellant.*

*Richard Hendrix, on behalf of Southern States Police Benevolent Association and North Carolina Police Benevolent Association, amici curiae.*

MARTIN, Justice.

On 13 April 1998, petitioner North Carolina Department of Environment and Natural Resources (DENR) demoted respondent Ranger L. Clifton Carroll (Ranger Carroll) from Park Ranger III to Park Ranger II and ordered a 5% reduction in his salary. Ranger Carroll filed a petition for a contested case hearing pursuant to N.C.G.S. § 126-34.1(a), and the case came on for hearing before Administrative Law Judge Beecher R. Gray on 30 July 1999. On 22 October 1999, Judge Gray entered a Recommended Decision directing that Ranger Carroll be reinstated to the position of Ranger III with back pay from the date of his demotion. In a Decision and Order signed 15 March 2000, the State Personnel Commission (SPC) unanimously adopted Judge Gray's recommended findings of fact and conclusions of law and ordered that Ranger Carroll be reinstated with back pay.

On 14 April 2000, DENR filed a petition for judicial review in Wake County Superior Court. On 4 March 2002, the trial court reversed the Decision and Order of the SPC. Ranger Carroll appealed, and the Court of Appeals affirmed the trial court's order in an unpublished opinion. *N.C. Dep't of Env't & Natural Res. v. Carroll*, 157 N.C. App. 717, 580 S.E.2d 99 (2003). We allowed Ranger Carroll's petition for discretionary review and now reverse.

I.

Ranger Carroll has served with DENR's Parks and Recreation Division (the Division) for almost twenty years. Prior to his demotion on 13 April 1998, he held the position of Park Ranger III. In that capacity, Ranger Carroll was responsible for many facets of the operation of Fort Fisher State Recreation Area (Fort Fisher), including hiring and supervising summer staff, protecting natural resources, and providing law enforcement protection. As a sworn law enforcement officer, Ranger Carroll was trained and authorized to carry a sidearm, to use deadly force, and to effect an arrest. Apart from his April 1998 demotion, Ranger Carroll has never been subject to any disciplinary action by the Division.

At 8:00 a.m. on Saturday, 21 February 1998, Ranger Carroll met with a crew of sixty volunteers at Fort Fisher to coordinate the planting of Christmas trees along the dunes of the beach. Ranger Carroll was supervising this project when, at approximately 9:20 a.m., he received a call from his wife informing him that his eighty-five-year-

old mother, who suffered from dementia and resided in the Alzheimer's unit of a nursing home in Southern Pines, had collapsed and was unresponsive. Just a week prior to his mother's collapse, the nursing home, Saint Joseph of the Pines (Saint Joseph's), had informed Ranger Carroll that his mother was showing signs of congestive heart failure. Ranger Carroll had a "very close" relationship with his mother and considered it his "obligation as her son to take care of her."

According to Ranger Carroll, his wife called to inform him that he "needed to call [Saint Joseph's] to confirm [his] permission to admit [his mother] to the hospital." Although his wife had attempted to give her permission to Saint Joseph's over the telephone, Ranger Carroll testified, "there was a question in everyone's mind . . . that [he], Clifton Carroll, her son, had to give the permission." Nurse Linda Reynolds (Nurse Reynolds), who placed the initial call to Ranger Carroll's wife, testified that she had attempted to reach Ranger Carroll to obtain any necessary authorizations, as he had the power of attorney for his mother's health care decisions. Nurse Reynolds described the situation with Ranger Carroll's mother as "very serious."

After trying unsuccessfully to reach Saint Joseph's by cellular telephone, Ranger Carroll resolved to return to his personal vehicle and either begin the long drive to Southern Pines or at least "get somewhere to contact the rest home" in order to attend to his mother's medical emergency. Accordingly, Ranger Carroll quickly relayed instructions to the volunteers in his vicinity and two co-workers who were helping to oversee the project, and then began the six-mile drive to Carolina Beach Park, where his personal vehicle was parked.

Ranger Carroll set out from Fort Fisher in his official vehicle and proceeded north on U.S. Highway 421. Upon entering the city limits of Kure Beach, however, he found himself stuck in slow traffic behind a "line of cars [traveling] bumper to bumper" in his lane. In an attempt to clear traffic, Ranger Carroll turned on his emergency flashers and dash-mounted blue lights. The cars ahead of him did not seem to notice, and soon traffic returned to the posted speed limit of thirty-five miles per hour.

As traffic cleared and he left the Kure Beach city limits, Ranger Carroll exceeded the speed limit for approximately six-tenths of a mile by driving up to forty-five miles per hour in a thirty-five mile per

hour zone. He also exceeded the speed limit for approximately one mile along a straight and open stretch of Dow Road by driving up to seventy-five miles per hour in a fifty-five mile per hour zone. Before exceeding both speed limits, Ranger Carroll confirmed that there was no traffic ahead of him and that there were no pedestrians or vehicles on either side of the road. At the time he exceeded the fifty-five mile per hour limit on Dow Road, the road ran straight and Ranger Carroll had a clear view for a long distance ahead.

Upon arrival at the Carolina Beach State Park office, Ranger Carroll parked his official vehicle near his personal vehicle and ran into the office building to call Saint Joseph's. Using the park office telephone, he successfully reached the Alzheimer's unit and within a few minutes was speaking with Nurse Reynolds, who updated him on his mother's condition.

Unbeknownst to Ranger Carroll, three Carolina Beach police officers arrived by patrol car at the park office while he was talking to Nurse Reynolds. The first to arrive was Detective William Jones, who had observed the flashing blue lights on Ranger Carroll's vehicle while engaged in a traffic stop in Kure Beach. Because the combined use of emergency flashers and blue lights, sometimes referred to as "running emergency traffic," designates an emergency situation to law enforcement officers, Detective Jones had followed Ranger Carroll to Carolina Beach to render assistance, if needed, to a state park officer. Next on the scene were Lieutenant Buck Jarman and Corporal Kurt Bartley, who arrived to provide backup for Detective Jones.

The three officers inspected Ranger Carroll's vehicle and the area around the building. Then, as Lieutenant Jarman waited in his patrol car, Detective Jones and Corporal Bartley walked to the park office building and knocked on the front door approximately four different times. Ranger Carroll heard voices outside the door but could not discern what was being said. Intent on communicating with Nurse Reynolds about his mother, he did not initially respond to the knocking at the door. Because the door to the office was solid and the blinds in the office were shut, Ranger Carroll did not see the uniformed officers standing outside the door or their patrol cars parked outside. After Detective Jones and Corporal Bartley knocked loudly for a fourth time on the office door, Ranger Carroll pulled the telephone from his mouth to respond.

The nature of Ranger Carroll's response was the subject of conflicting testimony at the 30 July 1999 hearing. Corporal Bartley and Detective Jones both testified that Ranger Carroll used profanity in telling them to wait until he was off the telephone, although neither took offense at the language used. Ranger Carroll, however, denied using profanity, testifying that he merely yelled "[w]ait a minute" in a "very loud, drawn-out manner." Nurse Reynolds, who was on the telephone with Ranger Carroll at the time, testified that she heard Ranger Carroll say something to the effect of "I'll be there in a minute" and that she "didn't hear any foul language."

After responding orally to the officers' knocks, Ranger Carroll quickly finished his conversation with Nurse Reynolds and opened the door to the office. Ranger Carroll then explained the situation to the officers and apologized for having caused them to come to the park. The officers told Ranger Carroll there was "no problem" and promptly left the premises, satisfied that their presence was not required.

After the other two officers had left, Detective Jones engaged in further discussion with Ranger Carroll. This discussion was also the subject of conflicting testimony at the 30 July 1999 hearing. Detective Jones testified that he informed Ranger Carroll that the officers had been concerned because of Ranger Carroll's speed and his use of emergency flashers and blue lights. According to Detective Jones, Ranger Carroll, who had previously been "calm," suddenly became indignant and asked in a sarcastic tone of voice, "Why, have you got a problem with me running emergency traffic?" Ranger Carroll, on the other hand, testified that he had asked Detective Jones if "there [was] a problem" in a "quiet and apologetic" manner. According to Ranger Carroll, his intent was to inquire sincerely whether he had "caused [Detective Jones] a problem." Ranger Carroll acknowledged that the words he chose "were awkward and didn't flow smoothly," but insisted that despite his use of the word "problem," he did not ask the question in a confrontational manner, as in the expression, "[H]ave you got a problem with that?" After speaking with Ranger Carroll for a few more seconds, Detective Jones reported to Lieutenant Jarman by radio "that we didn't have an incident going on there," and he too left the scene in his patrol car.

At the time Detective Jones left the park office, he had no intention to file a report about the incident or initiate a misconduct charge against Ranger Carroll. After he debriefed Lieutenant Jarman on his

conversation with Ranger Carroll, however, Detective Jones was instructed to write out a formal incident report. Lieutenant Jarman also contacted Ranger Carroll's supervisor, Carolina Beach State Park Superintendent Terri Taylor, to arrange a meeting to discuss Ranger Carroll's conduct. At the meeting, Lieutenant Jarman informed Superintendent Taylor that he had a complaint about one of the park rangers under her supervision. Lieutenant Jarman complained that the ranger had exhibited a "bad attitude" in his interaction with two Carolina Beach police officers and that Lieutenant Jarman was "concerned" with the ranger's use of his blue lights and emergency flashers.

After confirming that the ranger in question was Ranger Carroll, consulting with her supervisor, and acquiring a written statement from Ranger Carroll, Superintendent Taylor decided to discipline Ranger Carroll by demoting him from Ranger III to Ranger II with a 5% salary reduction. In accordance with departmental policy, Superintendent Taylor submitted a Disciplinary Action Routing Form setting forth the reasons for the disciplinary action taken. The principal reason offered was that Ranger Carroll had "willfully violated the Division Law Enforcement written guidelines on the use of emergency vehicles" by "willfully violat[ing] posted speed limits . . . with activated blue lights . . . while responding to a personal emergency." Superintendent Taylor also stated that Ranger Carroll's actions "constitute[d] a misuse of [his] authority, a misuse of state equipment, a violation of state traffic laws, a violation of written work rules, and caused needless endangerment to [himself] and to the general public." The form concluded that "[Ranger Carroll's] actions both during the incident and when confronted by officers of the Carolina Beach Police Department constitute[d] personal conduct unbecoming a state law enforcement officer." Ranger Carroll timely filed a petition for a contested case hearing to challenge his demotion and salary reduction.

## II.

[1] To set the stage for our discussion of the issues presented on appeal, we begin with a brief overview of North Carolina's statutory framework for appeals by public employees of disciplinary actions taken against them by their employing agencies or departments. Under the State Personnel Act (SPA), "[n]o career State employee . . . shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause." N.C.G.S. § 126-35(a) (2003); *see also* N.C.G.S. § 126-34.1(a)(1) (2003). A "career State employee" is

**N.C. DEP'T OF ENV'T & NATURAL RES. v. CARROLL**

[358 N.C. 649 (2004)]

defined as a state employee who "[i]s in a permanent position appointment" and "[h]as been continuously employed by the State of North Carolina in a [non-exempt] position . . . for the immediate 24 preceding months." N.C.G.S. § 126-1.1 (2003); *see also* N.C.G.S. § 126-5 (2003) (listing exempt positions).

A career state employee who alleges he or she has been dismissed, demoted, or suspended without pay in violation of N.C.G.S. § 126-35 must first pursue any grievance procedures established by the employing agency or department. N.C.G.S. §§ 126-34, -37(a) (2003); *see also Batten v. N.C. Dep't of Corr.*, 326 N.C. 338, 343, 389 S.E.2d 35, 38-39 (1990), *overruled. in part on other grounds by Empire Power Co. v. N.C. Dep't of Env't, Health & Natural Res.*, 337 N.C. 569, 447 S.E.2d 768 (1994). Once such internal grievance procedures have been exhausted, the aggrieved employee may demand a formal evidentiary hearing by filing a petition for a "contested case" with the Office of Administrative Hearings (OAH). N.C.G.S. §§ 126-34, 126-34.1(a)(1), 150B-23 (2003), 150B-25 (2003). A "contested case" is a quasi-judicial administrative proceeding to resolve the rights, duties, or privileges of a person involved in a dispute with an administrative agency. N.C.G.S. §§ 150B-2(2), -22 (2003).

A contested case hearing is presided over by an Administrative Law Judge (ALJ) and is governed by Article 3 of North Carolina's Administrative Procedure Act (APA). N.C.G.S. §§ 126-4.1(a) (2003), 126-34.1(a), 150B-23(a). Among the rights afforded to parties at a contested case hearing are the rights to present physical evidence and to examine and cross-examine witnesses. N.C.G.S. § 150B-25. The ALJ must decide the case only on the basis of the evidence presented and facts officially noticed, all of which are made part of the official record for purposes of administrative and judicial review. N.C.G.S. §§ 150B-37, -41(b), -42(a)-(b), -47 (2003). After the ALJ issues a "recommended decision,"[1] comprised of express written findings of fact and conclusions of law, each party is entitled to pursue an administrative appeal by filing exceptions and written arguments with the SPC. N.C.G.S. §§ 150B-36(a), 150B-34(a) (1999); *see also* 126-37(a).

---

1. We note that the General Assembly has recently enacted several significant amendments to the APA, including the deletion of the modifier "recommended" from the provisions cited above. These amendments apply to all contested cases commenced on or after 1 January 2001. *See* Act of July 12, 2000, ch. 190, secs. 4, 6-8, 2000 N.C. Sess. Laws 1284, 1285-99 (amending N.C.G.S. §§ 150B-29, -34, -36, and -37). Because Ranger Carroll's contested case was filed on 29 June 1998, they are inapplicable to the case at bar.

Upon review of the parties' arguments and the materials preserved in the official record, the SPC issues its final agency decision. N.C.G.S. §§ 150B-36(a),(b), -37. In addition to its authority under the APA to review the recommended decision of the ALJ, § 150B-36(a), the SPC is specifically authorized under the SPA to reinstate a wrongfully terminated employee and to order a salary adjustment or other suitable action to correct an improper disciplinary action. N.C.G.S. § 126-37(a). Because the SPC's decision and order constitutes a "final agency decision" for purposes of the APA, *id.*, it is subject to judicial review upon the petition of either the employee or the employing agency in the Superior Court of Wake County or the county where the petitioner resides, N.C.G.S. §§ 126-37(b2), 150B-43 (2003). Either party may then seek further review of the trial court's decision in the appellate division. N.C.G.S. § 150B-52 (2003).

### III.

[2] We first consider Ranger Carroll's contention that the trial court and Court of Appeals misapplied the applicable standards of review. Specifically, Ranger Carroll asserts that the trial court "erred by engaging in erroneous and improper fact finding" in the course of conducting its "*de novo*" review of questions of law and that the Court of Appeals erred by affirming the Superior Court. We agree.

On judicial review of an administrative agency's final decision, the substantive nature of each assignment of error dictates the standard of review. *ACT-UP Triangle v. Comm'n for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997); *State ex rel. Utils. Comm'n. v. Bird Oil Co.*, 302 N.C. 14, 21, 273 S.E.2d 232, 236 (1981); *see also Amanini v. N.C. Dep't of Human Res.*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118 (1994) (standard of review is not determined "merely by the label an appellant places upon an assignment of error"; court must determine the "actual nature of the contended error"). Under the APA, an agency's final decision may be reversed or modified only if the reviewing court determines that the petitioner's substantial rights may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible . . . in view of the entire record as submitted; or

(6) Arbitrary or capricious.

N.C.G.S. § 150B-51(b) (1999).[2]

As one commentator has noted, these grounds for reversal or modification of an agency's final decision fall into two conceptual categories. Charles E. Daye, *Powers of Administrative Law Judges, Agencies, and Courts: An Analytical and Empirical Assessment*, 79 N.C. L. Rev. 1571, 1592 n.79 (2001) [hereinafter Daye, 79 N.C. L. Rev. 1571]. The first four grounds for reversing or modifying an agency's decision—that the decision was "in violation of constitutional provisions," "in excess of the statutory authority or jurisdiction of the agency," "made upon unlawful procedure," or "affected by other error of law," N.C.G.S. § 150B-51(b)(1)-(4)—may be characterized as "law-based" inquiries. *Id.* The final two grounds—that the decision was "unsupported by substantial evidence . . . in view of the entire record" or "arbitrary or capricious," N.C.G.S. § 150B-51(b)(5),(6)—may be characterized as "fact-based" inquiries. *Id.*

It is well settled that in cases appealed from administrative tribunals, "[q]uestions of law receive *de novo* review," whereas fact-intensive issues "such as sufficiency of the evidence to support [an agency's] decision are reviewed under the whole-record test." *In re Greens of Pine Glen Ltd. Part.*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003). Thus, where the gravamen of an assigned error is that the agency violated subsections 150B-51(b)(1), (2), (3), or (4) of the APA, a court engages in *de novo* review. *See Meads v. N.C. Dep't of Agric.*, 349 N.C. 656, 665, 670, 509 S.E.2d 165, 171, 175 (1998); *Walker v. Bd. of Trs. of N.C. Local Gov'tal Employees' Ret. Sys.*, 348 N.C. 63, 65, 499 S.E.2d 429, 430 (1998); *Gainey v. N.C. Dep't of Justice*, 121 N.C. App. 253, 259, 465 S.E.2d 36, 41 (1996); *Air-A-Plane Corp. v. N.C. Dep't of Env't, Health & Natural Res.*, 118 N.C. App. 118, 124, 454 S.E.2d 297, 301 (1995). Where the substance of the alleged error implicates subsection 150B-51(b)(5) or (6), on the other hand, the reviewing court applies the "whole record test." *Meads*, 349 N.C. at

---

2. Subsection 150B-51(b)(6) now reads, "Arbitrary, capricious, or an abuse of discretion." *See* Ch. 190, sec. 11, 2000 N.C. Sess. Laws at 1290-91 (amending N.C.G.S. §§ 150B-51(b)(6) (1999)). Because this revision applies only to contested cases commenced on or after 1 January 2001, however, it has no application to the case at bar.

662-63, 509 S.E.2d at 170; *ACT-UP Triangle*, 345 N.C. at 706-07, 483 S.E.2d at 392; *see also Watkins v. N.C. State Bd. of Dental Exam'rs*, 358 N.C. 190, 199, 593 S.E.2d 764, 769 (2004); *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002).

Under the *de novo* standard of review, the trial court " 'consider[s] the matter anew[] and freely substitutes its own judgment for the agency's.' " *Mann Media*, 356 N.C. at 13-14, 565 S.E.2d at 17 (quoting *Sutton v. N.C. Dep't of Labor*, 132 N.C. App. 387, 389, 511 S.E.2d 340, 341 (1999)). When the trial court applies the whole record test, however, it "may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*." *Watkins*, 358 N.C. at 199, 593 S.E.2d at 769. "Rather, a court must examine all the record evidence—that which detracts from the agency's findings and conclusions as well as that which tends to support them—to determine whether there is substantial evidence to justify the agency's decision." *Id.* "Substantial evidence" is "relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C.G.S. § 150B-2(8b) (2003); *see also State ex rel. Comm'r of Ins. v. N.C. Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977).

[3] In the instant case, the trial court engaged in independent fact-finding in the course of conducting its "*de novo*" review of DENR's contention that Ranger Carroll "committed a job-related violation of law, which is just cause for demotion." The court explained that "[u]nder the *de novo* standard, the Court undertakes to review all the evidence of the record, and to make independent findings of fact, as though the Commission had not considered the case." On the basis of its own "*de novo*" findings of fact, the trial court concluded that Ranger Carroll had violated the Dow Road speed limit without lawful justification or excuse and that "this violation of the law of the State alone supported Ranger Carroll's demotion." The Court of Appeals affirmed, stating that "the issue of whether Carroll was authorized to exceed the speed limit" was a question of law subject to *de novo* review and that a trial court conducting *de novo* review of an agency's final decision must " ' "consider a question anew, as if not considered or decided by the agency[] previously . . . [and] must make its own findings of fact . . . and cannot defer to the agency its duty to do so." ' " *N.C. Dep't of Env't & Natural Res. v. Carroll*, No. COA02-714, 2003 N.C. App. LEXIS 953, at *11-12 (unpublished opinion) (citations omitted).

We disagree with this articulation of the *de novo* standard of appellate review. This Court has never stated that a trial court should issue new findings of fact in a contested case when conducting *de novo* review of a question of law.[3] The Court of Appeals has referred to such a rule, however, on at least five occasions, all within the past four years. *See N.C. Forestry Ass'n v. N.C. Dep't of Env't & Natural Res.*, 162 N.C. App. 467, ——, 591 S.E.2d 549, 555 (February 3, 2004); *N.C. Dep't of Corr. v. Brunson*, 152 N.C. App. 430, 435, 567 S.E.2d 416, 420 (2002); *Smith v. Richmond Cty. Bd. of Educ.*, 150 N.C. App. 291, 295, 563 S.E.2d 258, 263 (2002); *In re Roberts*, 150 N.C. App. 86, 90, 563 S.E.2d 37, 41 (2002), *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 38 (2003); *Jordan v. Civil Serv. Bd.*, 137 N.C. App. 575, 577, 528 S.E.2d 927, 929 (2000). The progenitor of this line of cases appears to be *Jordan v. Civil Service Board*, in which the Court of Appeals stated,

> Because " '*[d]e novo*' review requires a court to consider a question anew, as if not considered or decided by the agency" previously (*Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 674, 443 S.E.2d 114, 118 (1994)), the trial court must make its own findings of fact and conclusions of law and cannot defer to the agency its duty to do so.

137 N.C. App. at 577, 528 S.E.2d at 929.

Notably, *Jordan* cites no direct authority for the proposition that a court exercising *de novo* review should, as a general rule, eschew an agency's findings of fact in favor of its own. Instead, *Jordan*

---

3. To be sure, a "*de novo*" hearing or trial conducted pursuant to a specific statutory mandate requires judge or jury to disregard the facts found in an earlier hearing or trial and engage in independent fact-finding. *See, e.g.*, N.C.G.S. §§ 1-301.1(b) (2003) (providing a right to a "trial or hearing de novo" in superior court of an order or judgment entered by the clerk of superior court); 7A-196(b) (2003) ("Upon appeal to superior court [of judgment in criminal case entered by district court judge without jury trial] trial shall be de novo, with jury trial as provided by law."); 7A-228(a) (2003) (judgments of magistrates in small claims cases subject to "trial de novo" in district court); 5A-21(b2) (2003) (superior court must conduct a "hearing de novo" before ordering a party imprisoned for civil contempt); 7A-290 (2003) ("Any [criminal] defendant convicted in district court before the magistrate may appeal to the district court for trial de novo before the district court judge."). A "trial de novo" is a "new trial on the entire case—that is, on both questions of fact and issues of law—conducted as if there had been no trial in the first instance." *Black's Law Dictionary* 1512 (7th ed. 1999). The "trial *de novo*" concept should not be confused with the "*de novo*" standard of review that applies when the trial court acts, as here, in the capacity of an appellate court, *see Mann Media*, 356 N.C. at 12, 565 S.E.2d at 17, and reviews an agency decision for errors of law and procedure, *see In re Greens of Pine Glen*, 356 N.C. at 647, 576 S.E.2d at 319.

appears to rely on the assumption that a court's obligation to "consider a question anew" necessarily implies an obligation to make independent findings of fact based on a review of the record evidence. *Id.* This assumption, however, distorts the very nature of the "*de novo*" standard of appellate review applicable to contested cases arising under the APA.

When the trial court exercises judicial review over an agency's final decision, it acts in the capacity of an appellate court. *Mann Media*, 356 N.C. at 12, 565 S.E.2d at 17; *Avant v. Sandhills Ctr. for Mental Health*, 132 N.C. App. 542, 545, 513 S.E.2d 79, 82 (1999). It is the traditional function of appellate courts to review the decisions of lower tribunals for errors of law or procedure, *see* N.C. Const. art. IV, § 12, N.C.G.S. § 7A-27(b) (2003), N.C. R. App. P. 16(a), while generally deferring to the latter's "unchallenged superiority" to act as finders of fact, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233, 113 L. Ed. 2d 190, 199 (1991); *see also State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996) ("If supported by competent evidence, the trial court's findings of fact are conclusive on appeal."). In a contested case under the APA, as in a legal proceeding initiated in District or Superior Court, "there is but one fact-finding hearing of record when witness demeanor may be directly observed." Julian Mann III, *Administrative Justice: No Longer Just a Recommendation*, 79 N.C. L. Rev. 1639, 1653 (2001) [hereinafter, Mann, 79 N.C. L. Rev. 1639]. Thus, the ALJ who conducts a contested case hearing possesses those "institutional advantages," *Salve Regina Coll.*, 499 U.S. at 233, 113 L. Ed. 2d at 199, that make it appropriate for a reviewing court to defer to his or her findings of fact. Moreover, the *Jordan* rule would render an administrative agency's statutory responsibility to find facts in contested cases a pointless formality, at least in cases where errors of law are alleged. The judicial review provisions of the APA should not be construed to substantially undermine the General Assembly's judgment that administrative agencies, not courts, should perform the primary fact-finding function in contested cases. *See* N.C.G.S. §§ 150B-34(a), -36(b) (ALJ and agency decisions to include express findings of fact); *cf. Watson v. N.C. Real Estate Comm'n*, 87 N.C. App. 637, 640, 362 S.E.2d 294, 296 (1987) (stating that "whole record" standard of review is not intended to encourage "judicial duplication" of administrative findings).

We observe that newly enacted subsection 150B-51(c) requires a reviewing court to engage in independent "*de novo*" fact-finding in all contested cases commenced on or after 1 January 2001 where

the agency fails to adopt the ALJ's initial decision. Ch. 190, sec. 11, 2000 N.C. Sess. Laws at 1290-91 (codified as N.C.G.S. § 150B-51(c) (2003)); *Cape Med. Transp., Inc. v. N.C. Dep't of Health & Human Servs.*, 162 N.C. App. 14, 21, 590 S.E.2d 8, 13 (2004); *Town of Wallace v. N.C. Dep't of Env't & Natural Res.*, 160 N.C. App. 49, 54 n.1, 584 S.E.2d 809, 813-14 n.1 (2003). Subsection 150B-51(c) provides, in pertinent part:

> In reviewing a final decision in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the administrative law judge's decision, the court *shall review the official record, de novo, and shall make findings of fact* and conclusions of law. In reviewing the case, the court shall not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision.

N.C.G.S. § 150B-51(c) (2003) (emphasis added). This subsection requires courts to engage in independent fact-finding but only when the agency rejects the ALJ's decision. *Id.* It does not redefine the "*de novo*" standard governing judicial review over questions of law. *See* Mann, 79 N.C. L. Rev. 1639, 1654-55 (describing the addition of section 150B-51(c) as a "substantial departure from previous statutory law," but noting that "[w]hen the agency adopts the ALJ decision, there is very little change in the appellate review standards"); Daye, 79 N.C. L. Rev. 1571, 1589 ("When the agency adopts the ALJ's decision, the scope of the review will be the traditional one: limited substantial evidence review of facts and de novo review of questions of law."). Moreover, because subsection 150B-51(c) applies only to contested cases commenced on or after 1 January 2001, it has no application to the instant case.

Prior to the enactment of N.C.G.S. § 150B-51(c), this Court consistently held that where the findings of fact of an administrative agency are supported by substantial competent evidence in view of the entire record, they are binding on the reviewing court, and that court lacks authority to make alternative findings at variance with the agency's. *In re Appeal of AMP, Inc.*, 287 N.C. 547, 561, 215 S.E.2d 752, 761 (1975); *In re Appeal of Reeves Broad. Corp.*, 273 N.C. 571, 579, 160 S.E.2d 728, 733 (1968); *In re Property of Pine Raleigh Corp.*, 258 N.C. 398, 404-05, 128 S.E.2d 855, 860 (1963); *In re Berman*, 245 N.C. 612, 616-17, 97 S.E.2d 232, 235 (1957). Except insofar as it has been partially abrogated by N.C.G.S. § 150B-51(c), we now reaffirm

this longstanding principle. To the extent that cases such as *Jordan* and its progeny suggest otherwise, they are overruled.

**[4]** When an " 'order or judgment appealed from was entered under a misapprehension of the applicable law,' " an appellate court may remand for application of the correct legal standards. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 469, 597 S.E.2d 674, 693 (2004) (quoting *Concerned Citizens of Brunswick Cty. Taxpayers Ass'n v. Holden Beach Enters.*, 329 N.C. 37, 54-55, 404 S.E.2d 677, 688 (1991)); *see also State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310 (1984), *habeas proceeding at McDowell v. Dixon*, 858 F.2d 945 (4th Cir. 1988). This Court has also recognized, however, that in cases appealed from administrative tribunals, the trial court's erroneous application of the appropriate standard of review does not automatically necessitate remand. *See, e.g., Mann Media*, 356 N.C. at 15-16, 565 S.E.2d at 18-19 (declining to remand for proper application of the appropriate standard of review in the interests of judicial economy); *Brooks v. McWhirter Grading Co.*, 303 N.C. 573, 579-80, 281 S.E.2d 24, 28-29 (1981) (applying the appropriate provisions of N.C.G.S. § 150A-51(b) based on the nature of the errors alleged on appeal without considering the standards of review applied by the trial court and Court of Appeals); *N.C. Savings & Loan League v. N.C. Credit Union Comm'n*, 302 N.C. 458, 464-65, 276 S.E.2d 404, 409-10 (1981) (exercising *de novo* review pursuant to N.C.G.S. § 150A-51(4) based on the nature of the issues presented on appeal, despite the fact the proper standard of review "has nowhere been addressed in the lower courts"); *Bird Oil Co.*, 302 N.C. at 19-22, 273 S.E.2d at 234-36 (reviewing issues on appeal from administrative agency under the standard of review the Court of Appeals and trial court *should have* applied).

In *Capital Outdoor, Inc. v. Guilford County Board of Adjustment,* a divided panel of the Court of Appeals remanded to the trial court because it could not determine what standard of review the trial court had utilized to review the decision of the Guilford County Board of Adjustment. 146 N.C. App. 388, 391-92, 552 S.E.2d 265, 268 (2001). In explaining this disposition, the Court of Appeals majority stated that "to speculate which standard of review the superior court utilized presents a dangerous path which we are not inclined to travel." *Id.* at 391, 552 S.E.2d at 268. In dissent, Judge Greene stated that remand was unnecessary because an appellate court's obligation to review for errors of law, *see* N.C.G.S. §§ 7A-27(b), 150B-52, N.C. R. App. P. 16(a), "can be accomplished by addressing the dispositive issue(s) before the agency and the su-

perior court" and determining how the trial court *should have* decided the case upon application of the appropriate standards of review. *Id.* at 392, 552 S.E.2d at 268 (Greene, J., dissenting). On appeal, this Court "reverse[d] the decision of the Court of Appeals as to the standard of review" for the reasons stated in Judge Greene's dissenting opinion, thereby adopting Judge Greene's analysis of the standard of review issue for precedential purposes. *Capital Outdoor, Inc. v. Guilford Cty. Bd. of Adjust.*, 355 N.C. 269, 559 S.E.2d 547 (2002). Accordingly, in cases appealed from an administrative tribunal under the APA, it is well settled that the trial court's erroneous application of the standard of review does not automatically necessitate remand, provided the appellate court can reasonably determine from the record whether the petitioner's asserted grounds for challenging the agency's final decision warrant reversal or modification of that decision under the applicable provisions of N.C.G.S. § 150B-51(b). *Shackleford-Moten v. Lenoir Cty. DSS*, 155 N.C. App. 568, 572, 573 S.E.2d 767, 770 (2002).

In the present case, the trial court's erroneous articulation and application of the *de novo* standard of review in no way interferes with our ability to assess how that standard *should have been applied* to the particular facts of this case. Moreover, the status of Ranger Carroll's employment and salary has remained unsettled during the past six years of ongoing litigation. Thus, in the interests of judicial economy and fairness to the parties, we proceed to consider the substantive issues on appeal.

IV.

[5] The dispositive issue before this Court is whether the Court of Appeals erred in affirming the trial court's judgment that Ranger Carroll had engaged in "unacceptable personal conduct" constituting "just cause" for his demotion under N.C.G.S. § 126-35 and 25 NCAC 1J .0604(b) (June 2004).

Determining whether a public employer had just cause to discipline its employee requires two separate inquiries: first, "whether the employee engaged in the conduct the employer alleges," and second, "whether that conduct constitutes just cause for [the disciplinary action taken]." *Sanders v. Parker Drilling Co.*, 911 F.2d 191, 194 (9th Cir. 1990), *cert. denied*, 500 U.S. 917, 114 L. Ed. 2d 101 (1991). Because the first of these inquiries is a question of fact, the SPC's factual findings as to the conduct alleged are reviewed under the whole record test. *See Skinner v. N.C. Dep't of Corr.*, 154 N.C. App.

270, 274-78, 572 S.E.2d 184, 188-90 (2002); *Kea v. Department of Health & Human Servs.*, 153 N.C. App. 595, 606, 570 S.E.2d 919, 926 (2002), *aff'd per curiam,* 357 N.C. 654, 588 S.E.2d 467 (2003). Because the latter inquiry is a question of law, the SPC's conclusion as to whether the employee's conduct gave rise to "just cause" for the disciplinary action taken is reviewed *de novo. See Skinner,* 154 N.C. App. at 280, 572 S.E.2d at 191; *Gainey,* 121 N.C. App. at 259 n.2, 465 S.E.2d at 41 n.2; *Daye,* 79 N.C. L. Rev. 1571, 1592-93. In all contested cases commenced prior to 1 January 2001, the aggrieved employee bears the burden of proving that he was disciplined without just cause. *See Peace v. Employment Sec. Comm'n,* 349 N.C. 315, 328, 507 S.E.2d 272, 281 (1998) (noting that the burden of proof was not expressly addressed in the SPA and " 'judicially allocat-[ing]' " that burden to the employee " 'on considerations of policy, fairness, and common sense' " (quoting 1 Kenneth S. Broun, Brandis & Broun on North Carolina Evidence § 37 (4th ed. 1993)). *But see* Ch. 190, sec. 13, 2000 N.C. Sess. Laws at 1292 (codified as N.C.G.S. § 126-35(d) (2003)) (providing that for all contested cases commenced on or after 1 January 2001, the burden of proving that an employee was disciplined for "just cause" shall "rest[] with the department or agency employer").

By statute, "just cause" for the dismissal, suspension, or demotion of a career state employee may be established only on the basis of "unsatisfactory job performance" or "unacceptable personal conduct." N.C.G.S. § 126-35(a),(b); *see also* 25 NCAC 1J .0604, .0612 (June 2004). Here, it is undisputed that Ranger Carroll is a "career state employee" subject to the protections of N.C.G.S. § 126-35(a), and at no stage of these proceedings has DENR alleged that his job performance with the Division has been anything but satisfactory. Accordingly, Ranger Carroll's demotion can be sustained only on the ground of "unacceptable personal conduct."

Neither "just cause" nor "unacceptable personal conduct" is defined by statute. Pursuant to its rule-making authority, however, the SPC has defined "unacceptable personal conduct" to include, in pertinent part,

(1) conduct for which no reasonable person should expect to receive prior warning; or

(2) job-related conduct which constitutes a violation of state or federal law; or

. . . .

(4) the willful violation of known or written work rules; or

(5) conduct unbecoming a state employee that is detrimental to state service.

25 NCAC 1J .0614(i)(1),(2),(4),(5) (June 2004).

In the present case, the ALJ and the SPC both concluded that Ranger Carroll had demonstrated that DENR lacked "just cause" for imposing discipline on the basis of "unacceptable personal conduct." Specifically, the SPC concluded that Ranger Carroll's "reasonable belief" that he could treat the medical emergency with his mother "as one of necessity" authorizing him to use his vehicle's emergency devices and to exceed the speed limit along an open section of road prevented his actions from constituting "conduct for which no reasonable person should expect to receive prior warning." 25 NCAC 1J .0614(i)(1). The SPC further concluded that Ranger Carroll did not engage in "unacceptable personal conduct" on the basis of his alleged "violations of State law" and "willful violation of written work rules." The SPC stated that "[w]hile this may be a close question, justice would appear to support the proposition that [Ranger Carroll] could, under the immediate press of what he had been told about his mother's collapse, proceed under the same privilege or exception to [the Division's] policies and guidelines as he could for some other person involved in a health related situation deemed an emergency . . . ."

The trial court reversed the SPC's final decision, concluding that Ranger Carroll had engaged in unacceptable personal conduct by (1) violating the posted speed limit on Dow Road without lawful justification or excuse, (2) willfully violating the Division's written guidelines for the use of emergency vehicles, and (3) engaging in "conduct unbecoming a State employee, and . . . detrimental to State service" in his interaction with Detective Jones and Corporal Bartley. The Court of Appeals affirmed the trial court's judgment on the first ground alone, holding that Ranger Carroll's violation of the speed limit on Dow Road constituted unacceptable personal conduct providing "just cause" for his demotion pursuant to 25 NCAC 1J .0614(i)(2). In the interest of achieving finality in the instant case, we consider each of the asserted grounds for DENR's demotion of Ranger Carroll.

First, DENR argues, and the Court of Appeals held, that Ranger Carroll violated state law by exceeding the speed limit on Dow Road,

thus engaging in "unacceptable personal conduct" constituting "just cause" for his demotion. *See* 25 NCAC 1J .0614(i)(2). The Court of Appeals stated that section 20-145 of the Motor Vehicle Act suspends application of speed limitations to law enforcement officers only when an officer is "in the chase or apprehension of violators of the law or of persons charged with or suspected of any such violation." N.C.G.S. § 20-145 (2003). Because Ranger Carroll was neither chasing nor apprehending violators of the law at the time he exceeded the Dow Road speed limit, the Court of Appeals reasoned, his decision to exceed the speed limit violated state law, thus constituting "unacceptable personal conduct" under N.C.G.S. § 126-35 and 25 NCAC 1J .0614(i)(2).

We disagree, however, with the premise that N.C.G.S. § 20-145 necessarily sets forth the *exclusive* conditions under which a law enforcement officer may be legally entitled to exceed a posted speed limit. *See Parish v. Hill*, 350 N.C. 231, 238, 513 S.E.2d 547, 551 (1999) (noting that N.C.G.S. § 20-145 establishes "a general standard of care" for police officers involved in motor vehicle pursuits "rather than an exemption from speed laws"); *cf. Collins v. Christenberry*, 6 N.C. App. 504, 509, 170 S.E.2d 515, 518 (1969) (rejecting argument that specificity of N.C.G.S. § 20-145 reflects legislative intent *not* to exempt law enforcement officers, under any circumstances, from other provisions of the Motor Vehicle Act). The speed limit laws of this state were enacted "for the protection of persons and property and in the interest of public safety, and the preservation of human life." *State v. Norris*, 242 N.C. 47, 53, 86 S.E.2d 916, 920 (1955). Following the Court of Appeals' reasoning, a police officer who exceeds the speed limit while rushing a wounded partner to a nearby emergency room, or while racing to render assistance at the scene of a fire, would necessarily be in violation of state law and subject to demotion or termination at the election of his or her public employer. We do not believe the General Assembly intended to impose such a rigid restriction on law enforcement officers' vital discretion to make split-second decisions in matters affecting public safety. *Cf. Whitley v. Albers*, 475 U.S. 312, 320, 89 L. Ed. 2d 251, 261 (1986) (noting that courts are appropriately hesitant "to critique in hindsight [law enforcement] decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance").

We need not decide, however, under what circumstances a law enforcement officer may legally exceed the speed limit, or whether Ranger Carroll was legally entitled to do so on the facts of the instant

case. Even assuming Ranger Carroll lacked legal justification or excuse for exceeding the Dow Road speed limit, in light of all the facts and circumstances of this case, his conduct did not warrant demotion under the "just cause" standard. We acknowledge that SPC regulations define "just cause" to include "unacceptable personal conduct" and "unacceptable personal conduct" to include "job-. related conduct which constitutes a violation of state or federal law." 25 NCAC 1J .0604(b)(2), .0614(i)(2). Nonetheless, the fundamental question in a case brought under N.C.G.S. § 126-35 is whether the disciplinary action taken was "just." Inevitably, this inquiry requires an irreducible act of judgment that cannot always be satisfied by the mechanical application of rules and regulations.

"Just cause," like justice itself, is not susceptible of precise definition. *See, e.g.,* 1 Isidore Silver, *Public Employee Discharge and Discipline,* § 3.01, at 237 (3d ed. 2001); Roger I. Abrams & Dennis R. Nolan, *Toward a Theory of "Just Cause" in Employee Discipline Cases,* 1985 Duke L.J. 594, 599 (1985); Warren Martin, *Employment at Will: Just Cause Protection through Mandatory Arbitration,* 62 Wash. L. Rev. 151, 164 (1987). It is a " 'flexible concept, embodying notions of equity and fairness,' " that can only be determined upon an examination of the facts and circumstances of each individual case. *Crider v. Spectrulite Consortium, Inc.,* 130 F.3d 1238, 1242 (7th Cir. 1997) (quoting *Arch of Ill. v. Dist. 12, UMW,* 85 F.3d 1289, 1294 (7th Cir. 1996)); *see also IMC-Agrico Co. v. Int'l Chem. Workers Council,* 171 F.3d 1322, 1327-28 (11th Cir. 1999) (employee's infraction of work rules did not automatically establish "just cause" for termination under collective bargaining agreement; arbitrator acted within his discretion in considering "seriousness of the offense and the employee's work record"). Thus, not *every* violation of law gives rise to "just cause" for employee discipline. *See Steeves v. Scotland Cty. Bd. of Health,* 152 N.C. App. 400, 408-09, 567 S.E.2d 817, 822-23 (2002) (rejecting contention that any violation of state law necessarily constitutes "unacceptable personal conduct" for purposes of the SPA), *disc. rev. denied,* 356 N.C. 444, 573 S.E.2d 512 (2002); *accord State ex rel. Ashley v. Civil Serv. Comm'n,* 183 W. Va. 364, 367-68, 395 S.E.2d 787, 790-91 (1990) (per curiam) (stating that "just cause" provision in state civil service act requires " 'misconduct of a substantial nature' " and does not encompass " 'technical violations of statute or official duty without a wrongful intention' " (citations omitted)).

In the instant case, we cannot conclude that DENR had "just cause" to demote. Ranger Carroll.[4] It is undisputed that Ranger Carroll has been a reliable and valued employee of DENR's Division of Parks and Recreation for almost twenty years with no prior history of disciplinary actions against him. Superintendent Taylor, his direct supervisor, testified that Ranger Carroll had always been a "very good employee" who comported himself with honesty, integrity, and respect for others. When asked whether he "set a good example as a law enforcement officer," Superintendent Taylor responded that she "kn[ew] of no situations where he has been anything other than what he was supposed to be." Moreover, the SPC found that Ranger Carroll "was told that his permission was needed to admit [his mother] to the hospital" and that he exceeded the speed limit because of his reasonable belief that he could treat the emergency situation with his mother as "one of necessity." Finally, it is undisputed that Ranger Carroll exceeded the speed limit on Dow Road for just over one mile, and only after he had determined that the road ran straight and there were no vehicles or pedestrians ahead of him. The fact that Ranger Carroll employed the blue lights and emergency flashers on his vehicle during this brief interval further demonstrates his concern for public safety. In light of these somewhat unusual facts and circumstances, Ranger Carroll's decision to exceed the posted speed limit for a brief period on an open stretch of road, while exercising due regard for the safety of others and in the reasonable belief that such action was necessitated by a medical emergency, did not rise to the level of personal misconduct that would justify the substantial disciplinary actions taken against him.

[6] We next address whether Ranger Carroll's alleged "willful violation" of the Division's written guidelines for the use of emergency vehicles constituted "just cause" for his demotion. By SPC regulation, "unacceptable personal conduct" may be predicated upon a "willful violation of known or written work rules." 25 NCAC 1J .0614(i)(4). Citing this rule, DENR asserts that Ranger Carroll willfully violated the Division's written work guidelines for the use of emergency vehicles. The relevant portions of these guidelines are excerpted below:

4. We emphasize that we do not necessarily *condone* Ranger Carroll's conduct; nor do we hold that his decision to exceed the speed limit was legally justified or excused. Indeed, public employees entrusted with the maintenance or operation of state vehicles should always be mindful of "the interests of the public in not being subjected to unreasonable risks of injury." *Parish*, 350 N.C. at 236, 513 S.E.2d at 550; *see also Norris v. Zambito*, 135 N.C. App. 288, 293-95, 520 S.E.2d 113, 117-18 (1999). Our inquiry here, however, is limited to the issue of whether DENR had "just cause," under all the facts and circumstances, to demote Ranger Carroll.

12.1.1   Operation of an emergency vehicle with emergency devices activated may occur:

12.1.1.1  Only when the vehicle is operated by a commissioned employee performing law enforcement functions. At such times, when in the reasonable belief of the operator, an emergency is imminent or exists and the activation of emergency warning devices is necessary in order to protect life or render assistance.

. . . .

12.1.4   Emergency vehicles may be operated to a maximum of 30 MPH in excess of the posted or prima facie speed limit.

Guideline 12.1.1.1 permits a law enforcement officer to use emergency warning devices when the officer has a "reasonable belief" that an emergency situation exists. The guidelines do not demand certainty; nor do they provide any objective definition of the word "emergency." Thus, it is immaterial whether Ranger Carroll's permission was in fact required to admit his mother to the hospital, so long as he had a "reasonable belief" that his assistance was required to "protect life or render assistance." In the present case, the SPC found as a fact that Ranger Carroll had such a "reasonable belief." On the basis of this finding, the SPC concluded that Ranger Carroll's conduct did not constitute a willful violation of work rules.

The trial court reviewed the SPC's findings regarding Ranger Carroll's motivations for his conduct under the whole record test. Because Ranger Carroll's subjective state of mind is manifestly a question of fact, this was the correct standard of review to apply. *See Kea,* 153 N.C. App. at 606, 570 S.E.2d at 926 (applying whole record test to factual issues in public employee discipline case). The trial court erred, however, in its application of that test.

Based on its own review of the record evidence, the trial court rejected the SPC's finding that Ranger Carroll had a "reasonable belief" that he could treat the situation as one of medical necessity. The court observed that (1) Ranger Carroll's wife did not testify at the hearing and (2) other evidence in the record suggested that his mother was already being transported to the hospital by the time Saint Joseph's attempted to contact him. In light of this evidence, the court concluded that "Ranger Carroll's hearing testimony, that he was required to give permission for his mother to be admitted to the hos-

pital, [was] of insubstantial weight" to support [the SPC's] finding. The court then stated, "Under the whole record review standard, the Court is authorized to find, and finds that the facts are that Ranger Carroll, when he exceeded the Dow Road speed limit [and used his blue lights and emergency flashers], did so because he desired to obtain further information on his mother." Because this purpose did not give Ranger Carroll authority to exceed the speed limit or employ the emergency devices on his vehicle, the trial court concluded, Ranger Carroll's "willful" noncompliance with the guidelines justified DENR's decision to demote him.

On appeal, the Court of Appeals declined to uphold Ranger Carroll's demotion on these grounds, stating that the trial court "incorrectly performed whole record review" by making unwarranted new findings of fact. We agree.

It is well settled that "it is for the administrative body, in an adjudicatory proceeding, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence[,] if any." *State ex rel. Utils. Comm'n v. Duke Power Co.*, 305 N.C. 1, 21, 287 S.E.2d 786, 798 (1982). Accordingly, a reviewing court applying the whole record test may not independently weigh the evidence of record or substitute its evaluation of the evidence for that of the adjudicating agency. *In re Appeal of AMP, Inc.*, 287 N.C. at 561-62, 215 S.E.2d at 761. Rather, a court must review all the evidence of record to determine whether the agency's findings have a "rational basis" in the record. *In re Rogers*, 297 N.C. 48, 65, 253 S.E.2d 912, 922 (1979).

In the present case, the trial court impermissibly re-weighed the credibility of Ranger Carroll's testimony concerning his motivations for speeding and operating the blue lights and emergency flashers on his vehicle. Although the trial court, reviewing a cold record, did not find Ranger Carroll's testimony credible, the ALJ, who had the opportunity to observe witness demeanor, apparently did. In addition, the trial court ignored the corroborating testimony of Nurse Reynolds, who testified that she sought to contact Ranger Carroll in order to obtain any necessary authorizations, as well as Ranger Carroll's written statement that he held the power of attorney for his mother's health care decisions. In sum, the evidence of record, taken as a whole, supports a reasonable conclusion that Ranger Carroll was motivated by his "reasonable belief" that his conduct was necessitated by a medical emergency. Accordingly, the trial court's indepen-

dent findings of fact concerning Ranger Carroll's motivation for his conduct, and the conclusions of law based thereon, were in error.[5]

DENR argues, however, that even if Ranger Carroll reasonably believed that an emergency existed, he was not authorized under Guideline 12.1.1.1 to exceed the speed limit or to use the emergency devices on his vehicle. Guideline 12.1.1.1 permits the use of emergency devices "[o]nly when the vehicle is operated by a commissioned employee performing law enforcement functions." According to DENR, the emergency situation with Ranger Carroll's mother was a "personal" emergency, not a work-related one, and thus Ranger Carroll's actions in tending to his mother's needs were not a "law enforcement function." We disagree.

Aiding citizens in distress is one of the many important ways in which law enforcement officers serve the citizens of this state. Indeed, North Carolina law enforcement officers are specifically trained to render assistance to persons in need of medical attention. *See* N.C. Justice Acad., *Basic Law Enforcement Training: Instructor Notebook*, § .09.01A, at 1-44 (1985). While the circumstances presented here certainly imparted a personal dimension to Ranger Carroll's concerns, his professional obligation to assist those in need of emergency medical care did not cease to be a "law enforcement function" simply because the person in distress happened to be a member of his family.

In addition, a reasonable officer could interpret guideline 12.1.4, concerning the maximum speed at which an emergency vehicle may be operated, to authorize an officer to exceed the speed limit by up to thirty miles per hour whenever, in the officer's reasonable belief, an emergency situation was present. Because the SPC found that Ranger Carroll had such a reasonable belief, Ranger Carroll's decision to speed, even assuming it was technically in violation of

5. We observe that there is some authority for the proposition that a reviewing court may make independent findings of fact once it has properly determined that an agency's findings are not supported by substantial evidence. *See Beaufort Cty. Sch. v. Roach,* 114 N.C. App. 330, 335, 443 S.E.2d 339, 341 (1994), *disc. rev. denied,* 336 N.C. 602, 447 S.E.2d 384 (1994) *and cert. denied,* 513 U.S. 989, 130 L. Ed. 2d 398 (1994); *Scroggs v. N.C. Criminal Justice Educ. & Training Standards Comm'n,* 101 N.C. App. 699, 702-03, 400 S.E.2d 742, 745 (1991). *But see State ex rel. Utils. Comm'n v. Mead Corp.,* 238 N.C. 451, 465, 78 S.E.2d 290, 300 (1953) (remanding to Utilities Commission for new findings of fact where trial court correctly determined that agency's initial findings were not supported by substantial evidence in view of the entire record). Because we do not agree with the trial court's conclusion that the SPC's findings were unsupported by substantial evidence, we need not resolve this question here.

the Division's guidelines, was not a "willful" violation for purposes of 25 NCAC 1J .0614(i)(4).

[7] Finally, we consider the trial court's conclusion that DENR had just cause to demote Ranger Carroll because Ranger Carroll engaged in "conduct unbecoming a state employee that is detrimental to state service," 25 NCAC 1J .0614(i)(5), in his interaction with Detective Jones and Corporal Bartley.

The trial court purported to apply the whole record test in reviewing DENR's contention that Ranger Carroll "engaged in unprofessional behavior towards members of the Carolina Beach Police Department." Although the SPC made no express finding as to whether Officer Carroll had behaved inappropriately in his interaction with Officer Jones, the trial court found that "Ranger Carroll lashed out at Officer Jones, because he was angry and embarrassed that he was reminded that he had improperly run emergency traffic." On this basis, the court concluded that Ranger Carroll's "lashing out was conduct unbecoming a State employee, and . . . detrimental to State service" upon which the SPC should have sustained Ranger Carroll's demotion.

As we stated in *In re Rogers*, "the 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." 297 N.C. at 65, 253 S.E.2d at 922. In the instant case, the ALJ and the SPC set out the conflicting testimony concerning Ranger Carroll's interaction with Detective Jones and Corporal Bartley, but made no express findings as to whether Ranger Carroll had used profanity or otherwise "lashed out" at the two officers. It is for the agency, not a reviewing court, "to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence[,] if any." *Duke Power Co.*, 305 N.C. at 21, 287 S.E.2d at 798. Thus, the trial court exceeded the scope of its reviewing power by reaching out *sua sponte* to resolve a conflict in the record evidence not addressed by the SPC. *See Dunlap v. Clarke Checks, Inc.*, 92 N.C. App. 581, 584-85, 375 S.E.2d 171, 174 (1989); *In re Bolden*, 47 N.C. App. 468, 471, 267 S.E.2d 397, 398-99 (1980).

Ordinarily, when an agency fails to make a material finding of fact or resolve a material conflict in the evidence, the case must be remanded to the agency for a proper finding. *Dunlap*, 92 N.C. App. at

584-85, 375 S.E.2d at 174. In the instant case, however, further proceedings are neither necessary nor advisable. Even assuming Ranger Carroll briefly "lashed out" at Detective Jones and Corporal Bartley in the stress of the moment, such a momentary lapse in judgment does not, under all the circumstances presented, constitute "just cause" for his demotion and attendant salary reduction.

Although there is no bright line test to determine whether an employee's conduct establishes "unacceptable personal conduct" and thus "just cause" for discipline, we draw guidance from those prior cases where just cause has been found. Our survey of the relevant cases indicates that "unacceptable personal conduct" implies misconduct of a much more serious nature than that alleged here. *See, e.g., Kea,* 153 N.C. App. 595, 570 S.E.2d 919 (employee violated known and written work rules, disobeyed direct order from superior, and made crude and offensive sexual advances to a co-worker); *Davis v. N.C. Dep't of Crime Control & Pub. Safety,* 151 N.C. App. 513, 565 S.E.2d 716 (2002) (highway patrol officer was stopped for speeding and driving while intoxicated); *N.C. Dep't of Corr. v. McNeely,* 135 N.C. App. 587, 521 S.E.2d 730 (1999) (correctional officer abandoned post without authorization and failed to remain alert while on duty); *Gray v. Orange Cty. Health Dep't,* 119 N.C. App. 62, 457 S.E.2d 892 (1995) (health department inspector engaged in inappropriate sexually oriented behavior during inspections of catering businesses owned by women), *disc. rev. denied,* 341 N.C. 649, 462 S.E.2d 511 (1995); *Leiphart v. N.C. Sch. of the Arts,* 80 N.C. App. 339, 342 S.E.2d 914 (1986) (division director at North Carolina School of the Arts surreptitiously organized meetings with other division directors to discuss complaints against their superior), *cert. denied,* 318 N.C. 507, 349 S.E.2d 862 (1986). In addition, assuming Ranger Carroll used profanity or otherwise "lashed out" at two fellow law enforcement officers, he did so under the extreme emotional stress of knowing that his mother, who suffered from Alzheimer's disease and had recently shown signs of congestive heart failure, was being transported to the hospital following a sudden collapse. In determining whether this alleged "lashing out" constitutes "conduct unbecoming a state employee," we cannot wholly ignore the influence of the natural bonds of filial devotion on Ranger Carroll's emotional state. Finally, we note that Detective Jones testified that he felt sympathy for Ranger Carroll, and both he and Corporal Bartley testified that they did not take personal offense with anything Ranger Carroll said or did. In light of these facts and circumstances, the trial court's findings of fact, even if they had been properly made, would not support

a conclusion that Ranger Carroll engaged in unacceptable personal conduct based on "conduct unbecoming a state employee."

In conclusion, we hold that, on the specific facts and circumstances of the present case, DENR did not have "just cause" to demote Ranger Carroll and reduce his salary. Accordingly, the decision of the Court of Appeals is reversed, and the case is remanded to that court for further remand to the Superior Court with instructions to affirm the State Personnel Commission's final agency decision.

REVERSED AND REMANDED.